IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CASE NO. 5:11-cv-00104-RLV-DSC

| | |
|---|---|
| JAMES KNOWLAND BEST, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | MEMORANDUM AND ORDER |
| ) | |
| TIME WARNER INC., WARNER ) | |
| BROS. ENTERTAINMENT INC., ) | |
| and LICENSING CORPORATION ) | |
| OF AMERICA, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment. (Doc. 34.)

In 1978, Plaintiff James Best, who played the role of Sheriff Rosco P. Coltrane in the American TV series *The Dukes of Hazzard*, entered into a contract with Warner Bros., which entitled him to certain payments of merchandising royalties. In his Complaint, filed July 28, 2011, Best alleges that Defendants have, among other things, "engaged in a concerted and systematic pattern of deception" in order to withhold from him money owed pursuant to this contract. Accordingly, Best here asserts a cause of action for breach of contract alongside a host of corollary claims.

## I. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

1

56(a). The movant has the initial responsibility of informing the district court of the basis for its motion and identifying those particular portions of the record before the Court that the movant believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In the event this burden is met, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 322 n.3. Thus, the nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. Rather, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a motion for summary judgment, the Court must view the evidence and any reasonable inferences arising therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Nevertheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) (quoting *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II. FACTUAL BACKGROUND

In November of 1978, Plaintiff and Defendant Warner Bros. entered into an agreement in regard to Plaintiff's role in *The Dukes of Hazzard*. This agreement entailed the following provision for merchandising royalties:

> In addition, and separate and apart from other compensation payable to you hereunder, we will pay you a sum equivalent to 5% of the gross merchandising revenues (after first deducting therefrom a merchandiser's fee of 50% thereof,

2

whether such fee is paid to us or to a third party) derived from the use of your name or likeness hereunder and actually received by us in U.S. dollars. In instances when such revenues are derived from the use of your name or likeness hereunder together with the name or likeness of another or others, on or in connection with the same item, the 5% merchandising royalty payable to you as aforesaid will be reduced proportionately but not to less than 2-1/2%.

(Doc. 36-5 at 5; Doc. 48-1 at 5.)[1]

Plaintiff's claim is rooted in divergent reports of royalties received in connection with *The Dukes of Hazard* licensed products through December 31, 1981. The first is a document identified by Plaintiff as Warner Communications, Inc.'s ("WCI's") Annual Report for 1981.[2] Therein, it is reported that "[p]roducts using a *Dukes of Hazzard* license achieved retail sales of $190 million in 1981, making the show one of the most valuable for licensing in television history." (Doc. 44-1 at 2.) The second is an audit of Best's merchandising royalties performed at Best's request by Solomon, Finger & Newman, Certified Public Accountants, in 1982. The auditors "examined the books and records of Licensing Corporation of America (LCA) . . . in regard to the royalties received . . . in connection with the "Dukes of Hazzard" licensed products covering the period from inception to December 31, 1981."[3] (Doc. 44-6 at 1.) The summary indicates that during this period, "the total of all earned royalties for "Dukes of Hazzard" related licensed products was approximately $4,600,000 . . . ." (Doc. 44-6 at 3.) Of fifty percent of that

---

[1] The agreement was amended in the early 1980s to provide Plaintiff with a 5% royalty on 50% of the gross merchandising revenues entailing the use of Plaintiff's name or likeness, regardless of whether he appeared with another cast member. (Doc. 35 at 3.)

[2] Defendants have identified Warner Communications, Inc., as Warner Bros.' former parent company. (Doc. 46 at 2.)

[3] LCA, which has not been in operation for over twenty years, is the predecessor in interest to WBCP, a subsidiary of Warner Bros. (Doc. 8 at 2–3; Doc. 35 at 2.)

amount, $737,413 was reported to result from the sale of merchandise that utilized Best's name or likeness. (*See id.*)

Reports and checks were sent to Plaintiff through 1992. That year, the report and check were returned to Warner Bros. as Plaintiff purportedly failed to update his address. No additional reports were sent until October 2009, and no additional checks were sent until June 2010. (Doc. 35 at 4.)

To explain the 1992–2009 gap in royalty letters, Plaintiff has proffered a letter from counsel for the Screen Actors Guild to the Vice President of Labor Relations for Warner Bros. Television. The letter references "representations previously made in writing by Warner Brothers that no royalties were due[ to then-anonymous claimant cast members of *The Dukes of Hazzard*] because of non-exploitation, which is rather difficult to believe based upon published information of the ongoing success of the merchandising for this series." (Doc. 44-5 at 3.) Being inadmissible hearsay as to the matter of such representations having been made, this statement is incompetent to oppose a summary judgment.

Taking the ratio of the total merchandising royalty figure in WCI's annual report to that within the LCA audit, Plaintiff, presuming Warner Bros. to have consistently understated the royalties due, may calculate royalties theoretically owed to him in a given year in light of royalty payments actually made for that year. This method of determining the extent of his injury, however, is impressively speculative.

### III. CONFLICT OF LAWS

The conflict of laws rules to be applied by this Court, which sits in diversity, must conform to those prevailing in North Carolina, the forum state. *See Klaxon Co. v. Stentor Elec.*

*Mfg. Co.*, 313 U.S. 487, 496 (1941). In this state, the "traditional conflict of laws rule is that matters affecting the substantive rights of the parties are determined by lex loci, the law of the situs of the claim, and remedial or procedural rights are determined by lex fori, the law of the forum." *Wachs Technical Servs., Ltd. v. Praxair Distribution, Inc.*, No. 11-633, 2012 WL 945215, at *2 (N.C. Ct. App. Mar. 20, 2012) (quoting *Boudreau v. Baughman*, 368 S.E.2d 849, 853–54 (N.C. 1988)). Therefore, with regard to Best's claims rooted in breach of contract, under North Carolina law, a choice-of-law provision to which contracting parties have agreed will be enforced. *Tanglewood Land Co. v. Byrd*, 261 S.E.2d 655, 656 (N.C. 1980) (requiring further, should the validity of such a provision be put into question, that "questions of contract construction and interpretation [be] governed by the law of the state where the contract was made").

Regarding Best's tort-based claims, "the state where the injury occurred is considered the situs of the claim." *Wachs*, 2012 WL 945215, at *2 (quoting *Boudreau*, 368 S.E.2d at 854).[4] Where Defendants insist that California law again applies, Plaintiff remarkably writes that because Plaintiff's claims "include thousands of injuries that occurred over thirty years and . . . continue[] with every sale of *The Dukes of Hazzard* merchandise worldwide, . . . [a] better course

---

[4] As suggested by Defendants (Doc. 35 at 8), the Supreme Court of North Carolina has yet to address the proper choice-of-law test for claims arising under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, and the state's courts of appeals have issued conflicting decisions, *see Stetser v. TAP Pharm. Prods., Inc.*, 598 S.E.2d 570, 580 (N.C. Ct. App. 2004) (citing state appellate decisions employing the "most significant relationship" test as well as the lex loci test). Noting this conflict, the U.S. District Courts for the Western and Eastern Districts of North Carolina have concluded "that the Supreme Court of North Carolina would employ the law of the situs test." *Martinez v. Nat'l Union Fire Ins. Co.*, , at *5 (citing *United Dominion Indus., Inc. v. Overhead Door Corp.*, 762 F. Supp. 126, 129 (W.D.N.C. 1991) (Mullen, J.)). Finding the reasoning of these courts persuasive, this Court would likewise apply the lex loci test.

for determining which substantive law governs . . . [is] to address and decide the question on a claim-by-claim basis after disposition of this motion." (Doc. 43 at 18.) Determination of the choice of law is necessary before a district court may properly address a summary judgment motion, and Plaintiff cannot escape an unfavorable ruling on the motion by evading the choice-of-law inquiry.

Finally, the Court adheres to the procedural rules of North Carolina, the forum state. *Chamock v. Taylor*, 26 S.E.2d 911, 913 (N.C. 1943).[5]

Here, with regard to the breach-of-contract claims, Best has made no viable challenge regarding the validity of the choice-of-law provision within the contract here at issue, which reads, "The contract shall be construed in accordance with the laws of the State of California." (Doc. 37-1 at 15.) The contract shall be so construed. *See Tanglewood Land*, 261 S.E.2d at 656 (requiring enforcement of choice-of-law provisions to which parties have agreed).

As to the tort claims,

> [i]n jurisdictions which apply the rule of lex loci delicti, an issue may arise as to whether the law of the state where an allegedly wrongful act or omission took place or that of the state where the injury or other harm was sustained should apply. In such a case, the place of the tort generally is considered to be the state where the injury or harm was sustained or suffered, and as a general rule, a victim should recover under the system in place where the injury occurred. That is, the situs of the tort ordinarily is the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place, and the substantive law of such state applies.

*Harco Nat. Ins. Co. v. Grant Thornton LLP*, 698 S.E.2d 719, 724 (N.C. Ct. App. 2010) (quoting 16 Am. Jur. 2d *Conflict of Laws* § 109 (2009)); *accord United Va. Bank v. Air-Lift Assocs., Inc.*,

---

[5] Additionally, North Carolina law is dispositive on whether an issue is substantive or procedural. *Williams v. Riley*, 26 S.E.2d 102, 104 (N.C. Ct. App. 1982).

339 S.E.2d 90, 94 (N.C. Ct. App. 1986) (deeming a plaintiff's injury to be sustained in the state "where the last act occurred giving rise to [the] injury"). Plaintiff has incorrectly applied the lex loci test when it focused its injury analysis on where the sales of merchandise took place.[6] Plaintiff's alleged injury, taking the form of deficient royalty payments, was felt following Defendants' final acts of calculating the payments due and issuing the payment instruments. On the record before the Court, payments were issued from Warner Bros.' principal place of business in Burbank, California. (*See, e.g.*, Docs. 36-7, 36-10, 36-12.) Therefore, the law of the State of California applies.

## IV. DISCUSSION

A. The Tenability of Plaintiff Best's Tort Claims

The list of tort claims here brought against Defendants is extensive: fraud, common-law

---

[6] Plaintiff, while seeking benefits under the contract, has simultaneously taken the position that the parties' contractual "relationship evolved during discrete periods of deceit, darkness and discovery" and so is no longer "governed solely by the [contract]" and thus does not preclude, for instance, a claim based in quasi-contract. (Doc. 43 at 28, 30.) The general rule in California is as follows:
> [O]ne who has been injured by a breach of contract has an election to pursue any of three remedies, to wit: "He may treat the contract as rescinded and may recover upon a quantum meruit so far as he has performed; or he may keep the contract alive, for the benefit of both parties, being at all times ready and able to perform; or, third, he may treat the repudiation as putting an end to the contract for all purposes of performance, and sue for the profits he would have realized if he had not been prevented from performing."

*Oliver v. Campbell*, 273 P.2d 15, 17–18 (Cal. 1954) (in bank) (citations omitted). When, after partial performance, the innocent party elects to disaffirm or rescind, there is no longer any contract which conclusively fixes a limit upon his recovery; hence, he may sue upon a quantum meruit. However, "affirmation of the contract, on the one hand, and rescission and restitution on the other, are alternative remedies." *B. C. Richter Contracting Co. v. Cont'l Cas. Co.*, 41 Cal. Rptr. 98, 104 (Cal. Ct. App. 1964). Here, Best's election to pursue his benefits under the contract is a bar to invoking an alternative theory of recovery. (*See, e.g.*, Doc. 43 at 28) (discussing Best's "entitlements" under the contract).

7

fraud, fraud by concealment, and promissory fraud; equitable fraud or unjust enrichment; misrepresentation; conversion; breach of fiduciary duty; misappropriation of rights of publicity; and unfair trade practices in contravention of the North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1. (Doc. 1 at 15–25.) However, this case presents a straightforward contract dispute, and these tort claims will accordingly be dismissed.[7]

First, Best asserts that Defendant Warner Bros. breached its fiduciary duties to him. (Doc. 1 at 22–23.) To establish such breach, Best must first prove that Defendant owed to him a fiduciary duty. In *Wolf v. Superior Court*, 130 Cal. Rptr. 2d 860 (Cal. Ct. App. 2003), the plaintiff assigned to Walt Disney Pictures and Television ("Disney") the rights to his novel and the character upon which the novel was based, while Disney agreed to pay the plaintiff royalties. The court, affirming dismissal of the plaintiff's breach-of-fiduciary-duty claim, held that "the contractual right to contingent compensation in the control of another has never, by itself, been sufficient to create a fiduciary relationship where one could not otherwise exist." *Id.* at 864. Moreover, the fact that the plaintiff reposed his trust and confidence in Disney to properly account for royalties did not create a fiduciary relationship. *Id.* "Every contract requires one party to repose an element of trust and confidence in the other to perform." *Id.* Therefore, Warner Bros.' contractual duties to collect royalties, to account for them, and to pass them on to Best did

---

[7] As noted by the Fourth Circuit,
> [t]he distinction between tort and contract possesses more than theoretical significance. Parties contract partly to minimize their future risks. Importing tort law principles of punishment into contract undermines their ability to do so. Punitive damages, because they depend heavily on an individual jury's perception of the degree of fault involved, are necessarily uncertain. Their availability would turn every potential contractual relationship into a riskier proposition.

*Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 346 (4th Cir. 1998) (quoting *Strum v. Exxon Co.*, 15 F.3d 327, 330 (4th Cir. 1994) (addressing North Carolina law)).

not create a fiduciary relationship.

Next, Best asserts a number of fraud-based claims. A fraud claim fails when it merely states an alleged breach of contractual duties and does not concern representations that are collateral or extraneous to the parties' contract. *Robinson Helicopter Co. v. Dana Corp.*, 22 Cal. Rptr. 3d 352, 359 (Cal. 2004). The same is true of claims for negligent misrepresentation based on a broken promise of future action, such as an unfulfilled promise to report or pay a specified percentage of royalties. *See Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*, 868 F. Supp. 2d 983, 995 (E.D. Cal. 2012) (explaining that under California's economic-loss doctrine, such claims of negligent misrepresentation are barred in the same manner as fraud claims). Here, the thrust of Best's claims for fraud and negligent misrepresentation is that Defendants falsely represented the amount of royalties due him. Such false representations are not collateral or extraneous to the contract, and the related claims are therefore barred.

Likewise, Best's claim for conversion is predicated on a breach of contractual duties. A conversion claim arises where there is an "act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Weiss v. Marcus*, 124 Cal. Rptr. 297, 303 (Cal. 1975). While money can be the subject of an action for conversion if a specific sum capable of identification is involved, "a mere contractual right of payment, without more, will not suffice." *Gerawan Farming, Inc. v. Rehrig Pac. Co.*, No. 1:11-01273, 2012 WL 691758, at *6 (E.D. Cal. Mar. 2, 2012) (quoting *Farmers Ins. Exch. v. Zerin*, 61 Cal. Rptr. 2d 707, 709 (Cal. Ct. App. 1997)) (holding that the failure to pay royalties gives rise to a debt and a breach of contract, not a claim for conversion). Best's claim for conversion regarding unpaid royalties will therefore be dismissed.

Next, Best asserts that Defendant Warner Bros. misappropriated his name or likeness. To prove this claim, Plaintiff must establish Defendant's use of his name or likeness for commercial purposes, his own lack of consent, and resulting injury. *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) (discussing both the common-law and statutory causes of action). As addressed in footnote six above, Best, here pursuing additional payments owed under the terms of the contract, has in effect elected to keep the contract alive.[8] Accordingly, Plaintiff is unable to establish a "lack of consent," having contractually consented to Warner Bros.' use of his name and likeness.

Likewise, Best's claim for equitable fraud or unjust enrichment may be done away with. Having elected to proceed under the terms of the contract, such a claim is improper. *See McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1091 (9th Cir. 2003) (noting that "no action for unjust enrichment lies where a contract governs the parties' relationship to each other").

Next, because Plaintiff's claim under the North Carolina Unfair Trade Practices Act has no application to Californian transactions, it shall be dismissed.

Next, in the absence of any underlying tort claim, Plaintiff's conspiracy claim shall be dismissed. *Favila v. Katten Muchin Rosenman LLP*, 115 Cal. Rptr. 3d 274, 287 (Cal. Ct. App. 2010) ("Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort.")

---

[8] Although "James Best did not and does not agree that the parties' relationship is governed *solely* by the series agreement" (Doc. 43 at 30) (emphasis added), such a position is legally untenable. While Best may choose which of the three remedies previously discussed to pursue, he may not conceptually merge these remedies.

Finally, "[i]n the absence of an independent tort, punitive damages may not be awarded for breach of contract even where the defendant's conduct in breaching the contract was wilful, fraudulent, or malicious." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 460 (Cal. 1994) (internal quotation and citations omitted). Plaintiff's claim for punitive damages is thus disallowed.

B.  Plaintiff Best's Breach-of-Contract Claim

Interpreting the facts in the light most favorable to Plaintiff, there remains a genuine dispute as to Defendants' satisfaction of their payment obligations *in 1981* under the terms of the contract. As indicated above, Plaintiff's efforts to extrapolate this alleged underpayment to other fiscal years are speculative. Problematically, Plaintiff relies on this extrapolation not only to proffer a measure of damages in other years but also to establish the *fact* of damages in other years. That is, Plaintiff has put forth little other evidence regarding potential underpayments of royalties.[9] Therefore, Plaintiff's breach of contract claim survives only as to the royalties owed in 1981. *See* Cal. Civ. Code § 3301 ("No damages can be recovered for breach of a contract which are not clearly ascertainable in both their nature and origin."); *Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000) ("[A] breach of contract claim requires a showing of appreciable and actual damage.") (citing *Patent Scaffolding Co. v. William Simpson Const. Co.*, 64 Cal. Rptr. 187 (Cal. Ct. App. 1967) ("A breach of contract without damage is not

---

[9] For instance, Plaintiff makes much ado about reporting differentials for the quarter ending June 30, 1984. (Doc. 43 at 14.) However, Plaintiff does not even acknowledge that the gross merchandising receipts listed in Document 44-3 impliedly entail only those funds derived from merchandise bearing Plaintiff's name or likeness, given the participant shares are calculated directly from the gross-receipts figure. By contrast, the LCA reports filed as Documents 44-8 through 44-10 appear to list royalties derived from *all* merchandise for the listed months.

actionable.")).

As to these 1981 payments, the Court does not find Plaintiff's claim to be necessarily time barred, as Defendants suggest. Although the Annual Report prompting this action was published in the early 1980s, the Court will not presume Plaintiff's omniscience and finds that the alleged underreporting was sufficiently difficult to detect as to merit the application of the delayed discovery rule. Moreover, in light of Plaintiff's request for the 1982 audit, the Court is persuaded that reasonable minds could find as sufficient Plaintiff's diligence in discovering Defendants' breach of contract. Therefore, whether Plaintiff exercised reasonable diligence under the circumstances is a question of fact left for the jury.[10] *See Gryczman v. 4550 Pico Partners, Ltd.*, 131 Cal. Rptr. 2d 680, 681 (Cal. Ct. App. 2003) (holding that the discovery rule may be applied where the harm "will not be reasonably discoverable by plaintiffs until a future time" and extending this rule to encompass breach-of-contract claims).

As regards Best's separate claim for breach of the implied covenant of good faith and fair dealing, if "the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract clause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 272 Cal. Rptr. 387, 400 (Cal. Ct. App. 1990). However, an exception exists where the plaintiff alleges that the defendant acted in bad faith to frustrate the contract's actual benefits. *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 852 (C.D. Cal. 2004) (citing *Guz v. Betchel Nat'l, Inc.*, 100 Cal. Rptr. 2d

---

[10] Plaintiff's claim for "detrimental reliance" is informative here. (Doc. 1 at 20.) Although this claim is simply another iteration of a claim for fraud, the allegations relating to the claim pertain to Plaintiff's excuse for inaction.

352, 353 (Cal. 2000)). In light of the alleged differential in merchandising royalties between the Annual Report and Best's 1982 audit, there is a genuine dispute as to whether Defendants acted in bad faith to frustrate Plaintiff's receipt of royalties under the contract. Accordingly, Defendants' Motion shall be denied as to this claim in regard to the 1981 royalty payments.[11]

## V. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendants' Motion for Summary Judgment be **GRANTED** in part and **DENIED** in part. Plaintiff's claims for fraud, common-law fraud, fraud by concealment, and promissory fraud (Claim I); equitable fraud or unjust enrichment (Claim II); misrepresentation (Claim III); conversion (Claim IV); detrimental reliance (Claim V); breach of fiduciary duty (Claim VIII); misappropriation of rights of publicity (Claim IX); conspiracy (Claim X); unfair trade practices in contravention of the North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1 (Claim XI); and punitive damages (Claim XII) are hereby **DISMISSED**. Plaintiff's claims for breach of contract (Claim VI) and breach of implied covenants of good faith and fair dealing (Claim VII) survive only as to merchandising royalties earned in 1981.

---

[11] Under California law, punitive damages are not recoverable for breach of the implied covenant of good faith and fair dealing outside the insurance context. *Spinks v. Equity Residential Briarwood Apartments*, 90 Cal. Rptr. 3d 453, 493 (Cal. Ct. App. 2009).

**IT IS FURTHER ORDERED** that all claims against Defendant Time Warner Inc. be **DISMISSED**, there having been no adequate explanation of any basis for establishing its liability for the contractual breach of its well-removed subsidiary.

Signed: January 4, 2013

Richard L. Voorhees
United States District Judge